# Supreme Court of Texas

No. 20-0932

Transcor Astra Group S.A., et al.,

*Petitioners,*

v.

Petrobras America Inc., et al.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued January 12, 2022**

JUSTICE BOYD delivered the opinion of the Court.

This dispute arises from a billion-dollar break-up between two large corporations engaged in the international petroleum business. The break-up resulted in numerous claims and lawsuits, which the parties ultimately resolved through a comprehensive settlement agreement. One party later filed both this suit and a separate arbitration proceeding, asserting that the other party's extensive corrupt and criminal conduct, along with its failure to disclose that conduct prior to the settlement agreement, renders the settlement agreement and the

parties' earlier agreement unenforceable. The trial court granted summary judgment for the defendant, holding that the settlement agreement—and, in particular, its release provisions and a disclaimer of reliance—bars the claims asserted both in this suit and in the arbitration proceeding. The court of appeals affirmed in part and reversed in part, and both parties petitioned for our review. Because we agree with the trial court that the parties fully and finally resolved the current claims through their comprehensive settlement agreement, we reverse and render judgment reinstating the trial court's final judgment.

## I.
## Background

Petrobras[1] and Astra[2] are international corporations engaged in the petroleum industry. In 2006, they entered into a Stock Purchase and Sale Agreement that resulted in a joint venture in which each company owned half the interests in a Texas oil refinery.[3] The parties quickly became embroiled in numerous disputes, resulting in 2009 in an arbitration award[4] that terminated their joint venture and required

---

[1] We generally use "Petrobras" to refer to one or more related entities including Petróleo Brasileiro S.A. and Petrobras America Inc.

[2] We generally use "Astra" to refer to one or more entities and individuals related to and aligned with Transcor Astra Group.

[3] The parties formed a new corporation, Pasadena Refining System, Inc., to serve as the refinery's owner. Each party owned fifty percent of PRSI's shares. The parties also formed and became equal partners in PRSI Trading Company, LP, to supply feedstocks to the refinery.

[4] The stock-purchase agreement contained an arbitration clause requiring the parties to arbitrate "any claim of fraud, misrepresentation or

2

Astra to sell its fifty-percent interest to Petrobras. Petrobras accepted the interest but then failed to pay Astra the $640 million purchase price. The parties' relationship soon disintegrated into a dozen or more separate lawsuits and disputes. By 2011, Astra obtained judgments against Petrobras totaling more than $750 million and had other pending claims demanding $400 million more.

The parties engaged in extended negotiations and reached a comprehensive settlement agreement in 2012. As part of the 2012 settlement agreement, Petrobras agreed to pay Astra over $820 million to satisfy all the judgments and pending claims and each party agreed to release any and all claims against the other.

Petrobras alleges it later discovered that Astra engaged in substantial corruption to convince Petrobras to accept the 2006 stock-purchase agreement and the 2012 settlement agreement on terms that were highly favorable to Astra. Specifically, Petrobras alleges that Astra's representatives paid $15 million to bribe certain Petrobras officials to agree to the 2006 stock-purchase agreement and then offered other bribes totaling $80–$100 million to "solve the problem" during the settlement negotiations. Unlike the bribes paid in connection with the 2006 stock-purchase agreement, Petrobras does not allege that anyone accepted the bribes offered in connection with the 2012 settlement agreement.

---

fraudulent inducement" and "any question of validity or effect of [the] Agreement including [the arbitration] clause."

In 2016, Petrobras initiated two legal proceedings against Astra. First, Petrobras[5] filed this suit against Astra[6] and several of its employees,[7] asserting that the defendants committed fraud (including common-law fraud and statutory fraud) and negligent misrepresentation and breached fiduciary duties by offering bribes and then failing to disclose the offers during the settlement negotiations. Petrobras included derivative claims for declaratory judgment, conspiracy, aiding and abetting, unjust enrichment, and exemplary damages and attorney's fees, and sought to invalidate the 2012 settlement agreement and render it unenforceable. Second, because the 2006 stock-purchase agreement included a clause requiring binding arbitration, Petrobras initiated an arbitration proceeding to invalidate the 2006 stock-purchase agreement based on the bribes allegedly paid in connection with that agreement.

Astra filed counterclaims in the lawsuit, seeking a judgment declaring that both agreements are valid and enforceable and that the settlement agreement bars the claims Petrobras asserted in the lawsuit and the arbitration proceeding. Astra asserted that Petrobras released

---

[5] The plaintiffs were Petrobras America Inc., Petróleo Brasiliero S.A.-Petrobras, Pasadena Refining System, Inc., PRSI Trading LLC, and PRSI Real Property Holdings, LLC.

[6] The corporate defendants were Astra Oil Trading NV, Transcor Astra Group S.A., Astra Oil Company, LLC, Astra Energy Holdings, Inc., Astra GP, Inc., Astra Tradeco LP, LLC, Pasadena Refinery Holding Partnership, and AOT Bis B.V.

[7] The individual defendants were Alberto Feilhaber, Clifford L. Winget, III, Kari Burke, John T. Hammer, Carlos E. Ortiz, Thomas J. Nimbley, Ireneusz Kotula, Charles L. Dunlap, Eric Bluth, Stephen Wade, Rolf Mueller, and Daniel Burla.

its breach-of-fiduciary-duty claims, as well as the claims it asserted in the arbitration proceeding, as part of the settlement agreement. And Astra asserted that Petrobras could not rely on Astra's alleged fraud to undo the 2012 settlement agreement because Petrobras expressly disclaimed any reliance on any of Astra's representations leading up to that agreement.

Astra filed a series of summary-judgment motions based on the release and the disclaimer of reliance.[8] The trial court granted those motions and, in June 2018, signed a final judgment ordering that Petrobras take nothing on its claims. The judgment declared that the 2012 settlement agreement and the release contained within it are valid, binding, and enforceable and that they bar Petrobras's claims, including the claims asserted in the arbitration proceeding. The judgment also awarded Astra about $1.3 million in attorney's fees and costs.

Petrobras appealed the final judgment,[9] and the court of appeals reversed. 633 S.W.3d 606 (Tex. App.—Houston [14th Dist.] 2020). The court held that Petrobras released its fiduciary-duty claims to the extent they relate to the 2006 stock-purchase agreement but not to the extent

---

[8] The Astra defendants first moved for summary judgment in response to Petrobras's original petition. They later supplemented their motions in response to Petrobras's first-amended, second-amended, and third-amended petitions. The trial court ultimately granted summary judgment on all claims in favor of all the Astra defendants.

[9] Petrobras also appealed two post-judgment orders, one granting Astra's motion for an anti-suit injunction to prohibit further proceedings in the arbitration and one denying Petrobras's motion to dismiss that motion under the Texas Citizens Participation Act. The court of appeals consolidated the three appeals for argument, but these other two appeals are not at issue in this Court.

5

they relate to the negotiation and signing of the 2012 settlement agreement. *Id.* at 621. The court also held that the settlement agreement's reliance disclaimer bars Petrobras's fraud claims against the Astra entities but not the fraud claims against the individual defendants in their individual capacities. *Id.* at 629–30. It held that the release bars Petrobras's remaining claims (for conspiracy, aiding and abetting, unjust enrichment, and exemplary damages) to the extent they are derivative of the fraud claims. *Id.* at 628. Finally, the court reversed the award of attorney's fees and costs. *Id.* at 633–34. It remanded the case to the trial court with instructions to render partial summary judgment in favor of the Astra entities and the individual defendants "as limited to their corporate capacities" and to conduct further proceedings on the remaining claims. Both Astra and Petrobras petitioned this Court for review.

## II.
## Release of the Fiduciary-Duty Claims

We begin by considering Petrobras's claims attacking the 2012 settlement agreement on the ground that the Astra defendants breached their fiduciary duties by paying bribes to obtain the 2006 stock-purchase agreement, offering bribes when negotiating the 2012 settlement agreement, and failing to disclose those actions to Petrobras. Petrobras alleges the individual Astra defendants owed fiduciary duties to Petrobras during the parties' settlement negotiations because they served as officers and directors of the joint-venture entities the parties created when they began their joint venture in 2006. And, according to Petrobras, the remaining Astra defendants knew about the bribery

6

offers and conspired with and aided and abetted the individual defendants to breach their fiduciary duties.

Astra obtained summary judgment dismissing these claims on the ground that Petrobras released them when it entered into the 2012 settlement agreement. The 2012 settlement agreement includes broad releases in which each party released and discharged the other parties from "any and all claims, demands, and causes of action of whatever kind or character, which the . . . Parties have, or may have in the future, based on any acts or omissions, whether known or unknown, that have occurred on or before" the agreement's effective date. The agreement expressly states that the release should be "construed as the broadest type of general release" and includes, "without limitation," all claims connected with the parties' then-pending disputes, all claims related to the 2006 stock-purchase agreement, all claims "growing out of, or connected in any way with, the Astra Parties' dealings with the Petrobras Parties," and all claims based on activities alleged to violate foreign or domestic laws or administrative rules.

Petrobras does not dispute that this language is broad enough to release the breach-of-fiduciary-duty claims it asserts against Astra in this case. But the 2012 settlement agreement also provides that, "[n]otwithstanding anything to the contrary," the released claims "shall not include any and all claims . . . arising out of, related to, or connected in any way with the alleged breach, enforcement, or interpretation" of the settlement agreement. Petrobras argues, and the court of appeals agreed, that—to the extent the fiduciary-duty claims sought to invalidate the 2012 settlement agreement (as opposed to the 2006 stock-

7

purchase agreement)—the claims fell within this "notwithstanding" provision because they involved "acts or omissions of the Astra defendants in connection with the negotiation and signing of the 2012 Settlement and sought to limit and undo payments made pursuant to that agreement." 633 S.W.3d at 621.

We do not agree that Petrobras's fiduciary-duty claims fall within the "notwithstanding" provision. The provision states that the released claims do not include claims "arising out of, related to, or connected in any way with" the "breach," "enforcement," or "interpretation" of the 2012 settlement agreement. Although the "in any way" language is broad, the language following it ("the alleged breach, enforcement, or interpretation") limits the "notwithstanding" provision more narrowly than if it referred to claims that generally "arise from, relate to, or are connected in any way with the 2012 settlement agreement." Some of the agreement's other provisions, for example, specify a forum for the resolution of disputes "arising out of or related to" the agreement, waive Petrobras's sovereign immunity for "any action related to" the agreement, waive a jury trial for any litigation "connected in any way with" the agreement, and allocate costs "incurred in connection with the negotiation and drafting of" the settlement agreement. By contrast, the "notwithstanding" provision does not cover all claims that "relate to" or "arise out of" the agreement or those made "in connection with the negotiation and drafting" of the agreement. Instead, it more narrowly covers only those claims that arise out of, relate to, or are connected with the agreement's "breach, enforcement, or interpretation." We must presume the parties intended that these words bear a particular

8

"significance and meaning." *Gates v. Asher*, 280 S.W.2d 247, 249 (Tex. 1955).

Petrobras contends that its fiduciary-duty claims relate to the "enforcement" of the settlement agreement because they seek to declare the agreement unenforceable, and they relate to the "interpretation" of the agreement because they require interpretation of the release and reliance-disclaimer provisions. We are not convinced. "Enforcement" means the act of "compelling compliance with a[n] . . . agreement." *Enforcement*, BLACK'S LAW DICTIONARY (11th ed. 2019). Petrobras's fiduciary-duty claims do not seek to compel compliance with the 2012 settlement agreement. Instead, Petrobras seeks to avoid compliance by invalidating the agreement based on Astra's conduct during the "negotiation and signing" of the agreement. In fact, Petrobras completed compliance years ago when it paid the settlement amount and now seeks to undo its compliance and recover some of those funds. Petrobras did not sue to enforce the agreement by complaining of its breach or by seeking clarification of its meaning but instead sued to invalidate the agreement by declaring it *un*enforceable. Within this context, at least, we think an important distinction exists between claims that relate to an agreement's "enforcement" and those that relate to its "enforceability."

Perhaps if we considered only the "notwithstanding" provision's language, Petrobras's argument could present a close call. If, for example, one party refused to comply with the settlement agreement and the other party filed suit to enforce it, that suit would likely relate to the agreement's "breach" or "enforcement." And although we need not

decide the issue here, it might be that the "notwithstanding" provision would permit the refusing party to assert counterclaims or defenses against enforcement based on the suing party's fraud or fiduciary breaches. But even if that were true, the difference between that example and this case is that the "peace" the parties purchased through the settlement agreement would initially be broken by a claim that seeks to "enforce" or uphold the settlement agreement, not undo it.

But even if the "notwithstanding" provision's language leaves room for debate, its context confirms our conclusion that it does not encompass Petrobras's claims to invalidate the agreement. As explained, the provision excepts certain claims from what is otherwise "the broadest type of general release," through which both parties released "any and all claims . . . of whatever kind or character," to the extent those claims are "based on any acts or omissions, whether known or unknown, that have occurred on or before" the agreement's effective date. Petrobras's claims that Astra breached its fiduciary duties by offering and failing to disclose bribes during the period leading up to the agreement's effective date fall squarely within this description. To construe the "notwithstanding" provision as allowing claims based on then-"unknown" conduct that occurred before the agreement's effective date would effectively nullify the broad release.

Instead, we read the "notwithstanding" provision as clarifying and confirming that although the parties agreed to "the broadest type of general release," it was not so broad as to preclude claims seeking to maintain the peace the parties purchased on the terms stated in the settlement agreement. In this sense, although both parties refer to the

provision as a "carve-out provision," we think that label is a misnomer. The provision does not "carve out" or "except" from the general release claims that would otherwise be included within the release. Instead, it states that the released claims "*shall not include*" claims related to the agreement's breach, enforcement, or interpretation. Reading the release and the notwithstanding provisions together, the parties agreed to release certain claims and further agreed that those claims do not include other claims. They did not agree to release certain claims except for some portion of those claims.

Petrobras's fiduciary-duty claims—based on allegations that, unbeknownst to Petrobras, Astra paid bribes to Petrobras representatives in connection with the 2006 stock-purchase agreement, offered bribes in connection with the 2012 settlement agreement, and then failed to disclose that misconduct during the parties' negotiations—fall squarely within the scope of the general release. These claims seek to nullify the settlement agreement based on conduct that occurred before its effective date; they do not relate to any effort to interpret or enforce the agreement or recover for its breach. As a result, they do not fall within the scope of claims the release "shall not include." We conclude that the court of appeals erred by reversing summary judgment for Astra on the fiduciary-duty claims related to the 2012 settlement agreement. And to the extent that Petrobras's claims for conspiracy, aiding and abetting, unjust enrichment, declaratory judgment, and exemplary damages are derivative of and dependent upon the fiduciary-duty claims, Astra is entitled to summary judgment on those claims as well.

11

## III.
## Fraud and the Disclaimer of Reliance

We next consider Petrobras's claims that Astra committed fraud and made negligent misrepresentations by offering and failing to disclose bribes during the parties' negotiations leading up to the 2012 settlement agreement. According to Petrobras, this fraudulent conduct induced Petrobras to enter into the settlement agreement and thus rendered the agreement unenforceable. Astra obtained summary judgment dismissing these claims on the ground that Petrobras expressly disclaimed any reliance on any "statement or representation" made by Astra or its agents, and instead, Petrobras confirmed that it relied solely on its "own judgment" and the advice of its own counsel.[10] The court of appeals (1) agreed that the disclaimer of

_____

[10] Petrobras made these representations within the following provision of the 2012 settlement agreement:

**EACH PARTY EXPRESSLY WARRANTS THAT IT HAS CAREFULLY READ THIS SETTLEMENT AGREEMENT AND ANY EXHIBITS ATTACHED TO IT, UNDERSTANDS THEIR CONTENTS, AND SIGNS THIS SETTLEMENT AGREEMENT AS ITS OWN FREE ACT. EACH PARTY EXPRESSLY WARRANTS THAT NO PROMISE OR AGREEMENT WHICH IS NOT HEREIN EXPRESSED HAS BEEN MADE TO IT IN EXECUTING THIS SETTLEMENT AGREEMENT, AND THAT IT IS NOT RELYING UPON ANY STATEMENT OR REPRESENTATION OF ANY AGENT OF THE OPPOSING PARTIES BEING RELEASED IN THIS SETTLEMENT AGREEMENT. EACH PARTY IS RELYING ON ITS OWN JUDGMENT, AND EACH PARTY HAS BEEN REPRESENTED BY LEGAL COUNSEL IN THIS MATTER. EACH PARTY EXPRESSLY WARRANTS THAT ITS RESPECTIVE LEGAL COUNSEL HAS READ AND**

reliance is enforceable and (2) agreed that the disclaimer bars Petrobras's fraud claims against the Astra entities, but (3) concluded that the disclaimer does not bar the fraud claims against the individual Astra defendants. 633 S.W.3d at 627–28, 630. In this Court, Petrobras challenges the first two holdings, and the Astra individuals challenge the third. We agree with Astra on all three.

## A.  Enforceability of the Reliance Disclaimer

Texas law encourages parties to resolve their disputes by agreement, but settlement agreements—like all other contracts—are unenforceable if they are procured by fraud. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178 (Tex. 1997). To establish such fraudulent inducement, a party seeking to invalidate an agreement must prove that it reasonably relied on the other party's misrepresentations to its detriment. *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019); *Italian Cowboy*, 341 S.W.3d at 337 (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)). Because "[a]fter-the-fact protests of misrepresentation are easily lodged," *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008), parties who mutually desire to resolve all disputes and buy complete and final peace often include provisions in their settlement agreements expressly disclaiming any reliance on each other's representations.

---

**EXPLAINED THE ENTIRE CONTENTS OF THIS SETTLEMENT AGREEMENT IN FULL, AS WELL AS THE LEGAL CONSEQUENCES OF IT.**

13

The law must balance society's interest in protecting parties against fraudulently induced promises with its interest in enabling parties to "fully and finally resolve disputes between them." *Schlumberger*, 959 S.W.2d at 179. To achieve this balance, we have held that contractual disclaimers of reliance may be enforceable and may negate a subsequent fraudulent-inducement claim if the disclaimer is clear, specific, and unequivocal. *See Lufkin*, 573 S.W.3d at 229; *Italian Cowboy*, 341 S.W.3d at 336; *Forest Oil*, 268 S.W.3d at 60; *Schlumberger*, 959 S.W.2d at 179. Whether a reliance disclaimer is effective in any given case "depends on the contract's language and the totality of the surrounding circumstances." *Lufkin*, 573 S.W.3d at 226; *Forest Oil*, 268 S.W.3d at 60; *Schlumberger*, 959 S.W.2d at 179. Specifically, courts must consider such factors as whether

(1)    the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute;

(2)    the complaining party was represented by counsel;

(3)    the parties dealt with each other at arm's length;

(4)    the parties were knowledgeable in business matters; and

(5)    the release language was clear.

*Forest Oil*, 268 S.W.3d at 60. In considering these factors, our ultimate purpose is to determine whether the contract clearly confirms that "the parties intended once and for all to resolve specific disputes." *Italian Cowboy*, 341 S.W.3d at 335; *see also Forest Oil*, 268 S.W.3d at 58; *Schlumberger*, 959 S.W.2d at 181.

The parties here agree that the second, fourth, and fifth factors weigh in favor of enforcing the reliance disclaimer in this case. Petrobras

is a sophisticated international corporation with extensive experience in the petroleum industry and was ably represented by top-notch attorneys during the negotiation and signing of the 2012 settlement agreement. And as we have explained, the language through which Petrobras broadly released all claims against Astra was clear and effective. But Petrobras argues that the first and third factors, as well as the overall equities of the circumstances, weigh against enforcing the reliance disclaimer in this case.

### 1. The first factor

The first factor concerns whether "the terms of the contract were negotiated, rather than boilerplate, and during negotiations, the parties specifically discussed the issue which has become the topic of the subsequent dispute." *Forest Oil*, 268 S.W.3d at 60. Petrobras acknowledges that the parties carefully negotiated the settlement agreement's terms, including the terms of the release, but contends that Astra did not disclose—and thus the parties did not discuss—the bribery scheme that gave rise to the current dispute.

According to Petrobras, this first factor at least requires that the parties' settlement negotiations included discussions about the negotiations leading to the 2006 stock-purchase agreement and the parties' subsequent disputes. *See, e.g.*, *Baker v. City of Robinson*, 305 S.W.3d 783, 796 (Tex. App.—Waco 2009, pet. denied); *Residencial Santa Rita, Inc. v. Colonia Santa Rita, Inc.*, No. 04-06-00778-CV, 2007 WL 2608564, at *3 (Tex. App.—San Antonio Sept. 12, 2007, no pet.) (mem. op.). By requiring that the parties specifically discussed these topics, Petrobras contends, the first factor ensures that Petrobras truly

15

intended to disclaim any reliance on representations Astra made about these topics during the parties' discussions. Otherwise, Petrobras asserts, the circumstances cannot support the conclusion that Petrobras truly intended to disclaim reliance and would instead allow Astra to exploit Petrobras's ignorance of the actual facts and benefit from its wrongdoing.

Astra, by contrast, contends that the first factor requires only that the parties specifically discuss the scope and effect of the release, which is ultimately the subject of the parties' current dispute. *See, e.g.*, *Leibovitz v. Sequoia Real Estate Holdings, L.P.*, 465 S.W.3d 331, 344 (Tex. App.—Dallas 2015, no pet.); *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 331 (Tex. App.—Houston [14th Dist.] 2011, no pet.). This factor is met, Astra contends, because the parties specifically discussed the fact that the settlement agreement's mutual releases purchased full and final peace, barring each party from ever asserting claims based on pre-settlement conduct, regardless of whether the party knew about that conduct when it signed the agreement. According to Astra, Petrobras's approach would require that the parties disclose and discuss "the very facts allegedly misrepresented or concealed," in which case the reliance disclaimer would serve no purpose.

As Petrobras insists, we found it significant in *Schlumberger* that the plaintiff had expressly and clearly disclaimed reliance on the defendant's representations about the feasibility and value of a diamond-mining project because that topic, "after all, was the very dispute that the release was supposed to resolve." 959 S.W.2d at 180. But in *Forest Oil*, we held that a reliance disclaimer was enforceable

even though the settlement resolved disputes over royalty-payment issues and not over environmental issues for which the plaintiff later sued. 268 S.W.3d at 58. So "while the misrepresentation in *Schlumberger* 'pertained to the very matter negotiated, settled, and released,'" the misrepresentation in *Forest Oil* "did not concern known disputed matters (which were settled and released) but potential future disputes (which were set aside and reserved)." *Id.* at 57. Although we ultimately noted that the parties in *Forest Oil* did discuss environmental issues during their settlement negotiations, we explained that *Schlumberger*'s observation that the misrepresentations there led to "the very dispute that the release was supposed to resolve" is "more accurately interpreted as emphatic language, not limiting language." *Id.* at 58. The important point from *Schlumberger*'s first factor, we explained, is that when "parties expressly discuss material issues during contract negotiations but nevertheless elect to include waiver-of-reliance and release-of-claims provisions, the Court will generally uphold the contract." *Id.* Ultimately, the question is whether the circumstances and nature of the parties' settlement discussions demonstrate that the parties considered the consequences of the reliance disclaimer in light of the material issues of the dispute, which supports the conclusion that an "all-embracing disclaimer of any and all representations" actually "shows the parties' clear intent." *Id.*

Here, the evidence does not suggest that the parties actually considered or discussed allegations that Astra representatives bribed Petrobras officials to approve the 2006 stock-purchase agreement or offered to bribe them to approve the 2012 settlement agreement. But the

evidence—including the terms of the settlement agreement itself—does establish that the parties entered into the settlement agreement only after an extended series of complex and hotly contested negotiations that included discussions about the need to resolve all prior, pending, and possible claims between the parties, including those that were "unknown" at the time. The circumstances leave no doubt that both parties intended to fully and finally resolve all their disputes "once and for all" and, to accomplish that objective, they knowingly agreed to disclaim any reliance on the other parties' representations. Although they may not have "specifically discussed the issue which has become the topic of the subsequent dispute," they expressly discussed the "material issues" and "nevertheless elect[ed] to include waiver-of-reliance and release-of-claims provisions" in their settlement agreement. *Id.* Even if the first factor does not carry the weight here that it carried in *Schlumberger,* we conclude it nevertheless tilts in favor of enforcing the reliance disclaimer.

### 2. The third factor

The third *Forest Oil* factor considers whether the parties dealt with each other in an arm's-length transaction. *Id.* at 60. "Generally, an arm's-length transaction is one between two unrelated parties with generally equal bargaining power, each acting in its own interest." *Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 832 (Tex. 2014). As a general rule, a transaction between fiduciaries is not an arm's-length transaction but instead requires higher fiduciary standards that require full disclosure of all material facts. *Schlumberger*, 959 S.W.2d at 175.

18

Petrobras contends this factor weighs against enforcement of the reliance disclaimer because the Astra individuals owed fiduciary duties to Petrobras during the negotiations leading to the 2012 settlement agreement. Specifically, Petrobras asserts that the individuals served as directors and officers of the jointly owned entities that Astra and Petrobras created to own, operate, and supply the oil refinery, and thus owed fiduciary duties to those entities and their shareholders, including Petrobras. And, according to Petrobras, the individuals continued to owe fiduciary duties to Petrobras even after they ceased serving as officers and directors—even during the subsequent years of disputes and litigation between Petrobras and Astra up until (and even after) the 2012 settlement agreement.[11]

We have doubts about Petrobras's contention that the directors and officers of the jointly owned entities assumed eternal fiduciary duties to Petrobras. In the first place, the directors and officers of the jointly owned entities owed fiduciary duties to those specific entities, not to each of the entities' individual shareholders. *See Ritchie v. Rupe*, 443 S.W.3d 856, 869 (Tex. 2014) ("[A] director is duty-bound to exercise

---

[11] *See Thywissen v. Cron*, 781 S.W.2d 682, 686 (Tex. App.—Houston [1st Dist.] 1989, writ denied) ("Once a fiduciary relationship has been established, it is presumed to continue until it is repudiated."); *see also Pacelli Bros. Transp. v. Pacelli*, 456 A.2d 325, 329 (Conn. 1983) ("[A] settlement agreement and general release cannot shield an officer or director who has failed in his fiduciary duty to disclose information relevant to a transaction with those whose confidence he has abused . . . ."); *BelCom, Inc. v. Robb*, No. CIV. A. 14663, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998) ("A former director, of course, breaches his fiduciary duty if he engages in transactions that had their inception before the termination of the fiduciary relationship or were founded on information acquired during the fiduciary relationship."), *aff'd*, 725 A.2d 443 (Del. 1999).

business judgment for the sole benefit of the corporation, and not for the benefit of individual shareholders . . . .”). Petrobras has not cited any authority to support the idea that the individuals owed fiduciary duties to Petrobras, separate and apart from the duties they owed to the entities they served. And second, we find it difficult to accept the proposition that the individuals must forever bear a fiduciary duty to Petrobras long after leaving their positions and even during extensive and protracted litigation between the two entities. Under Petrobras's theory, the Astra individuals would even now—in the midst of this present litigation—owe ongoing fiduciary duties to act in Petrobras's best interest.

But more importantly, even if the Astra individuals owed lingering fiduciary duties to Petrobras during the parties' settlement negotiations, we do not see how their failure to disclose the alleged bribe offers to Petrobras could affect the enforceability of the reliance disclaimer when Petrobras does not allege that anyone accepted the bribes or that the offers in any way affected Petrobras's decision to enter into the 2012 settlement agreement.[12]

Finally, as we explained in *Forest Oil* and reaffirmed in *Lufkin*, the existence of an arm's-length transaction is only one of the factors we must consider when deciding whether a reliance disclaimer is enforceable. *See Lufkin*, 573 S.W.3d at 229; *Forest Oil*, 268 S.W.3d at 60.

---

[12] We do not pass judgment on the continuing validity of the reliance disclaimer had Astra successfully bribed Petrobras into accepting the settlement agreement because Petrobras has not alleged such facts. *See Schlumberger*, 959 S.W.2d at 181 (“We emphasize that a disclaimer of reliance . . . will not always bar a fraudulent inducement claim.”).

20

Even if the Astra individuals owed fiduciary duties to disclose material information to Petrobras during the negotiations leading up to the 2012 settlement agreement, we cannot conclude that Petrobras could not have knowingly and intentionally disclaimed reliance on the individuals' representations under these circumstances. The individuals ceased serving as directors and officers in 2009 when, as a result of an arbitration award resolving numerous longstanding disputes, Astra transferred all of its interests in the jointly owned entities to Petrobras, and the joint venture ended. From that point until the parties entered into the 2012 settlement agreement, the parties continued vigorously litigating numerous disputes, and Astra obtained judgments against Petrobras totaling more than $750 million. As the adverse parties negotiated and ultimately signed the settlement agreement, Astra asserted additional pending claims seeking over $400 million more. Under these circumstances, any lingering fiduciary duties the Astra individuals may have owed do not support the conclusion that—contrary to its clear and express agreement otherwise—Petrobras relied on Astra's statements and representations rather than on its "own judgment" and the advice of its own counsel. Even if this third factor weighs against enforcing the reliance disclaimer, it does not weigh so heavily as to overcome the other factors.

### 3. The totality of the circumstances

When considering and balancing the *Forest Oil* factors to determine the enforceability of a reliance disclaimer, "[c]ourts must always examine . . . the totality of the surrounding circumstances." *Forest Oil*, 268 S.W.3d at 60. Petrobras argues that under these

circumstances, in which Astra paid millions of dollars in bribes to induce the 2006 stock-purchase agreement and then offered many millions more to obtain the 2012 settlement agreement, the law should not permit Astra to hide behind a reliance disclaimer to benefit from its wrongful and criminal conduct. Although we share Petrobras's concern over the equities at play, the "totality of the circumstances" that courts must consider in this context are those circumstances relating not to the fairness or unfairness of the parties' settlement agreement, but to the likelihood that, when they entered into the agreement, the parties truly intended to disclaim any reliance on each other's representations and "intended once and for all to resolve" their disputes. *Italian Cowboy*, 341 S.W.3d at 335; *see also Forest Oil*, 268 S.W.3d at 58; *Schlumberger*, 959 S.W.2d at 180.

As we explained in *Forest Oil*, "parties who contractually promise not to rely on extra-contractual statements—*more than that, promise that they have in fact not relied upon such statements*—should be held to their word." 268 S.W.3d at 60. Considering the *Forest Oil* factors within the context of the totality of the circumstances here, we can only conclude that Petrobras expressly and intentionally represented and agreed that it was not relying on any of Astra's statements or representations when it decided to execute the 2012 settlement agreement. We thus conclude that Petrobras's reliance disclaimer is enforceable.

## B.    Applicability of the Reliance Disclaimer

Petrobras next contends that, even if its reliance disclaimer is enforceable, it does not apply to and preclude the fraud claims Petrobras

asserts in this case. Specifically, Petrobras notes that it disclaimed reliance only on any "statement or representation" made by Astra prior to execution of the settlement agreement, and it asserts that its fraud claims complain not of any statements or representations but of Astra's failure to disclose the bribery payments and offers. According to Petrobras, it disclaimed reliance on affirmative misrepresentations but not on any failure to make statements or representations that should have been made.

Petrobras's pleaded allegations, however, are not limited to non-disclosures. Instead, Petrobras expressly alleged in its petition that Astra "made untrue representations of fact and/or omitted to state facts necessary to correct or make the statements and/or omissions that were made." And in any event, the settlement agreement expressly releases claims "based on any acts or omissions, whether known or unknown," so Petrobras could not rely on any omissions. Moreover, the reliance disclaimer warrants that "each party is relying on its own judgment," not on the disclosure of the other party. Because the settlement agreement forecloses Petrobras's argument, we hold that the reliance disclaimer applies to claims of both misrepresentations and omissions.

## C. Applicability to the Individual Defendants

Finally, with regard to the reliance disclaimer, Astra argues that the court of appeals erred by holding that the individual defendants are not entitled to summary judgment on Petrobras's fraud claims. The court of appeals noted that Petrobras sued the individual defendants "in their individual capacities," but concluded that the individuals' summary-judgment motion did not "expressly present any ground or

23

explain why as a matter of law" they are entitled to "the benefit of the reliance disclaimer" in their "individual capacities." 633 S.W.3d at 630. In other words, the court reversed summary judgment in the individual defendants' favor, not on the merits, but because the defendants' motion did not adequately specify that the reliance disclaimer protected them in their "individual," as opposed to their "corporate," capacities. *Id.* at 629.

We disagree. A summary-judgment motion "must stand or fall on the grounds expressly presented in the motion." *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993), but the "[g]rounds may be stated concisely, without detail and argument," *id.* at 340 (quoting *Roberts v. Sw. Tex. Methodist Hosp.*, 811 S.W.2d 141 (Tex. App.—San Antonio 1991, writ denied)). We conclude that the Astra individuals' motion sufficiently sought summary judgment against liability in their "individual" capacity because that is the only capacity in which Petrobras sought to impose liability on the individuals and the only capacity in which they could have been liable.

Individuals can "act" in a "corporate capacity" in the sense that they are acting as an agent, employee, or representative of a corporation. *See Bennett v. Reynolds*, 315 S.W.3d 867, 884 (Tex. 2010). If they commit a tort while acting in their corporate capacity, their employer may be held vicariously liable for their actions under the doctrine of respondeat superior. *Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 779 (Tex. 2021); *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 130 (Tex. 2018). But the fact that an individual was acting in a corporate capacity does not prevent the individual from being held personally—or

24

"individually"—liable for the harm caused by those acts. *Franka v. Velasquez*, 332 S.W.3d 367, 383 (Tex. 2011) ("[P]ublic employees (like agents generally) have always been individually liable for their own torts, even when committed in the course of employment, and suit may be brought against a government employee in his individual capacity."); *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002) (explaining that an agent who "personally ma[kes] misrepresentations . . . can be held personally liable"). When an individual commits a tort while acting in a "corporate capacity," either the corporation can be held vicariously liable or the individual can be held personally liable, or both, but the individual cannot be held "corporately" liable.

Petrobras relies on *Ambrosio v. EPS Wireless, Inc.*, No. 05-99-01442-CV, 2000 WL 1160696, at *3–4 (Tex. App.—Dallas Aug. 18, 2000, no pet.) (not designated for publication), for the proposition that a settlement agreement that releases all claims against a corporation and its "agents, employees[, and] officials" only releases those individuals from liability in their "corporate" or "official" capacity and does not release them from liability in their "individual" capacity. The issue in *Ambrosio*, however, was whether a corporate official could benefit from a release when the plaintiff alleged that the official promised to transfer stock to the plaintiff both "from the company *and himself.*" *Id.* at *1 (emphasis added). The court held that the official was not entitled to summary judgment based on the release because a fact issue existed as to whether, "at the time he made the promise to transfer" the stock, the official "was acting in the course and scope of his employment with" the company. *Id.* at *3.

25

*Ambrosio* is distinguishable from this case because the parties here do not dispute that the Astra individuals were acting within the course and scope of their employment when they paid, offered, and failed to disclose the bribes. Petrobras pleaded that the individuals were individually liable for that conduct, and the individuals moved for summary judgment on those claims. Because the only claims Petrobras pleaded—or could have pleaded—against the individuals were claims to hold them individually liable, the individuals did not have to seek summary judgment expressly against "individual" liability.

In addition to agreeing with the trial court that the individual defendants' summary-judgment motion was sufficient to obtain summary judgment against individual liability, we agree with the trial court that the individual defendants demonstrated that they were entitled to that relief. Petrobras relies on *Ambrosio* for the proposition that Petrobras's release was not sufficient to release claims against the individual defendants in their individual capacities because the release referred only to Astra's "agents" and did not expressly identify the individual defendants. But the issue here is whether the individuals were entitled to summary judgment on Petrobras's fraud claims, and on that issue, the question is not whether Petrobras released those claims but whether the reliance disclaimer prevents Petrobras from establishing the reliance necessary to recover from the individuals on those claims. Because Petrobras expressly disclaimed reliance on any statement or representation by any "agent" of Astra, we conclude that Petrobras cannot establish that any representation by the Astra individuals defrauded Petrobras.

Because Petrobras's disclaimer of reliance on Astra's statements and representations is enforceable and applies to the representations about which Petrobras now complains, and because the disclaimer negated the reliance element of Petrobras's fraud claims, we conclude that the Astra defendants were entitled to summary judgment on those claims. And to the extent that Petrobras's claims for conspiracy, aiding and abetting, unjust enrichment, declaratory judgment, and exemplary damages are derivative of and dependent upon the fraud claims, the defendants are entitled to summary judgment on those claims as well.

## IV.
## Arbitration Claims

In addition to declaring that the 2012 settlement agreement bars the claims Petrobras asserted in this lawsuit, the trial court's final judgment also declared that the agreement bars the claims Petrobras asserted in the separate arbitration proceeding it filed shortly after it filed this lawsuit. As in this lawsuit, Petrobras asserted in the arbitration proceeding that Astra "engaged in bribery and corruption in connection with" the parties' 2006 stock-purchase agreement and brought multiple claims, including claims for fraud, breach of contract, declaratory judgment, aiding and abetting breach of fiduciary duty, unjust enrichment, and racketeering, seeking exemplary damages, attorney's fees, and costs. But in the arbitration, Petrobras asserted the claims to challenge the enforceability of the 2006 stock-purchase agreement, rather than the 2012 settlement agreement. It did so because the stock-purchase agreement required arbitration of any claim or controversy arising out of or related to "any question of the validity

or effect of this Agreement including this clause." Based on this arbitration clause, Petrobras argues that the court of appeals erred by affirming the trial court's declaratory judgment.

Petrobras contends the arbitration clause requires the arbitrator, and not the courts, to resolve the claims filed in the arbitration. Astra argues, however, that the parties' 2012 settlement agreement resolved all claims between the parties and replaced and superseded the 2006 stock-purchase agreement, including the arbitration clause, so the arbitration agreement ceased to exist after the settlement agreement. But Petrobras contends that only the arbitrator can decide the "gateway" issue of whether the claims are arbitrable because the parties delegated to the arbitrator "any question of the validity or effect of [the arbitration] clause." *See Henry Schein, Inc. v. White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("Just as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator.").

The dispute over the arbitration, then, is whether, in light of the 2012 settlement agreement, the parties' agreement to arbitrate as set forth within the 2006 stock-purchase agreement still exists at all. And as the Supreme Court and this Court have explained, courts—and not arbitrators—must decide whether the parties "in fact delegated the arbitrability question to the arbitrator," *id.* at 531, "whether the parties are bound by a given arbitration clause," *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002), and "whether the parties made a valid *and presently enforceable* agreement to arbitrate," *G.T. Leach*

28

*Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 519 (Tex. 2015) (emphasis added). In short, courts must decide "whether an enforceable agreement to arbitrate . . . exists." *Id.* at 522. Because the parties here dispute whether their arbitration agreement continued to exist after the 2012 settlement agreement, we agree with the trial court and court of appeals that courts must decide that issue.

The Supreme Court has also instructed that "courts 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.'" *Henry Schein*, 139 S. Ct. at 531 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 939 (1995)); *see Howsam*, 537 U.S. at 83. Here, the 2006 stock-purchase agreement indisputably includes a clear and unmistakable agreement that the arbitrator will decide any question regarding the "validity" of the parties' arbitration agreement. But the 2012 settlement agreement just as clearly confirms that the parties later agreed to resolve all claims and to supersede the stock-purchase agreement. Several of the settlement agreement's provisions provide this confirmation.

First, the 2012 settlement agreement includes a merger clause in which the parties agreed that the settlement agreement "represents the entire agreement of the [p]arties and *supersedes all prior written or oral agreements*." [emphasis added.] The merger clause contains no language that could somehow be interpreted to except or preserve the parties' "prior written . . . agreement" to arbitrate disputes over the 2006 stock-purchase agreement.

Second, the settlement agreement includes a forum-selection clause in which the parties agreed that the state courts of Harris County

and the federal district court for the Southern District of Texas, Houston Division, would be "the exclusive forums for any dispute arising out of or related to this Settlement Agreement." Again, the clause contains no language that could be interpreted to except a dispute over the stock-purchase agreement or its arbitration clause or over the settlement agreement's effect on that clause. While arbitration clauses can survive and be harmonized with forum-selection clauses in subsequent agreements between parties, *see Sharpe v. AmeriPlan Corp.*, 769 F.3d 909, 915 (5th Cir. 2014), the forum-selection clause in the 2012 settlement agreement states that Harris County courts and the Southern District of Texas are "the *exclusive* forums for *any* dispute" regarding the settlement agreement, indicating the parties' intent to supersede the arbitration clause in the 2006 stock-purchase agreement. *See id.* at 917 ("The 'submit[ted] to the . . . jurisdiction' language demonstrates an intent for a court to adjudicate the merits of the claims."), 915–17 (comparing a "mere" venue clause, which can be harmonized with an arbitration clause, with "far more extensive" dispute-resolution clauses requiring all claims to be "submit[ted] to" particular courts, which could not be harmonized with an arbitration clause).

And finally, the parties agreed through the mutual release clauses to release "all claims, demands, and causes of action of whatever kind or character," including "any claim arising out of or related to the 2006 [stock-purchase agreement], including without limitation, any claims related to [any] covenants." The releases, again, contain no language that could be interpreted to preserve any claims regarding the

stock-purchase agreement or its arbitration clause. In fact, although the settlement agreement describes at length how and where any disputes over the settlement agreement should be resolved, it never mentions arbitration.

We conclude that the settlement agreement confirms that the parties agreed to supersede all prior agreements and to resolve any disputes over the settlement agreement in court. At a minimum, reading the arbitration agreement and the subsequent settlement agreement together, we cannot conclude that a presently enforceable arbitration agreement clearly and unmistakably exists. We thus conclude that courts, rather than the arbitrator, must decide whether an agreement to arbitrate claims regarding the 2006 stock-purchase agreement presently exists, and for the reasons we have explained, we conclude it does not.

In the absence of an arbitration agreement, the trial court properly decided whether the 2012 settlement agreement bars the claims Petrobras asserted in the arbitration proceeding. And we conclude the court correctly decided that it does. As we have explained, the settlement agreement included "the broadest type of general release" in which Petrobras released "any and all claims . . . of whatever kind or character, . . . whether known or unknown," including, "without limitation," all claims related to the 2006 stock-purchase agreement and all claims "growing out of, or connected in any way with, the Astra Parties' dealings with the Petrobras Parties." Because the claims Petrobras asserted in the arbitration proceeding squarely fit within this

release, we conclude that the trial court correctly held that the settlement agreement bars those claims.

## V.
## Attorney's Fees and Costs

Finally, as mentioned, the trial court granted summary judgment to Astra and awarded Astra about $1.3 million in attorney's fees and costs. Because the court of appeals reversed the judgment, it also reversed the fees-and-costs award and remanded that issue for the trial court to reconsider. 633 S.W.3d at 633–34. Because we reinstate the trial court's judgment, we elect to review the issues Petrobras raised on appeal regarding the fee award, which the parties renew here.

Petrobras argues that the trial court erred in granting attorney's fees and costs under section 37.009 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 37.009. Petrobras challenged the fee award on three bases: (1) Astra cannot collect attorney's fees because its declaratory-judgment claim merely duplicated issues that were already before the court, *see MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 670–71 (Tex. 2009); (2) Astra failed to segregate its fees between its declaratory-judgment claim and claims for which attorney's fees are not available, *see Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006) (stating that parties must generally segregate fees); and (3) the fee is unjust because of Astra's alleged criminal conduct.

We review section 37.009 fee awards under an abuse-of-discretion standard. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). "It is an abuse of discretion for a trial court to rule arbitrarily, unreasonably, or

32

without regard to guiding legal principles . . . or to rule without supporting evidence." *Id.* (citations omitted). First, although both parties' claims for declaratory judgment addressed the issue of whether the 2012 settlement agreement is valid and enforceable, Astra's counterclaim sought additional relief in the form of a declaration that the settlement agreement bars the separate arbitration proceeding as well as Petrobras's claims in this lawsuit. We thus conclude that Astra's counterclaim did not merely duplicate Petrobras's claim.

Second, the duty to segregate between recoverable and nonrecoverable attorney's fees does not apply when the services for which the fees are incurred "advance both a recoverable and unrecoverable claim," such that the "fees are so intertwined that they need not be segregated." *Chapa*, 212 S.W.3d at 313–14. Here, Astra reduced and segregated fees by eliminating hundreds of thousands of dollars in fees, reducing the hourly rate for certain attorneys as requested, and applying a thirty- to fifty-percent discount to hours billed. Moreover, because Astra sought to halt the arbitration proceeding by enforcing the settlement agreement's forum-selection clause, it necessarily had to prove that the agreement was valid and enforceable. We conclude that the trial court did not abuse its discretion by finding that any work completed to achieve those goals was sufficiently intertwined to negate any need for the fees to be segregated further. *See id.*

Third, we disagree that the trial court abused its discretion by concluding that its award of attorney's fees to Astra was equitable and just. Although we do not discount the seriousness of Petrobras's

33

accusations of bribery and other corrupt conduct by Astra, the trial court correctly concluded that Petrobras agreed to release and forgo any claims based on any conduct by Astra—whether known or unknown—when it agreed to the 2012 settlement agreement. By asserting claims it had agreed never to assert, Petrobras broke the promise it made in the settlement agreement and caused Astra to incur substantial fees and costs to enforce that promise. We conclude the trial court did not abuse its discretion by awarding Astra its fees and costs.

## VI.
## Conclusion

We hold that the 2012 settlement agreement bars Petrobras's claims against Astra because the release bars the fiduciary-duty claims and the reliance disclaimer prevents Petrobras from establishing the fraud claims. We reverse the court of appeals' judgment and render judgment reinstating the trial court's final judgment.

_____
Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** April 29, 2022

34